UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | | |
|---|---|---|
| **DONNA WHITE** | \* | **CIVIL ACTION NO. 12-0753** |
| **VERSUS** | \* | **JUDGE ROBERT G. JAMES** |
| **AETNA LIFE INSURANCE COMPANY OF HARTFORD, CONNECTICUT and THE SANOFI-AVENTIS LONG TERM DISABILITY PLAN** | \* | **MAG. JUDGE KAREN L. HAYES** |

### REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a petition for benefits under a disability insurance plan governed by the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq*. For reasons explained below, it is recommended that Plaintiff Donna White's claims be DENIED and DISMISSED WITH PREJUDICE.

On March 28, 2012, Donna White filed the instant complaint under ERISA against Aetna Life Insurance Company of Hartford, Connecticut ("Aetna"), the designated plan fiduciary for the employee welfare benefit plan ("the Plan") sponsored by White's former employer, The Sanofi-Aventis Long Term Disability Plan ("Sanofi-Aventis"). *See* Compl. Plaintiff contends that Defendants wrongfully denied her disability benefits under the Plan. (Compl.) Accordingly, she seeks a judgment ordering Defendants to reinstate her long term disability ("LTD") benefits under the Plan and declaring that she has a right to ongoing and future disability benefits, plus attorney's fees, costs, and prejudgement and post-judgment interest. *Id*.

Following the resolution of Plaintiff's motion to supplement the administrative record

[doc. # 16], the Court set a briefing schedule for submission of the matter for decision on the administrative record. (Nov. 6, 2012 ERISA Briefing Order [doc. # 23]). On December 19, 2012, Plaintiff filed her ERISA brief [doc. # 28], and Defendants filed their ERISA brief on January 14, 2013 [doc. # 29]. On January 28, 2013, Plaintiff field a Reply brief [doc. # 30].

## Relevant Facts

### A. Cardiothoracic Disease and Disability

Plaintiff Donna White is 55 years old and has worked as a full-time pharmaceutical sales representative for Sanofi-Aventis US, L.L.C. ("Sanofi-Aventis") since 2000. [Administrative Record ("AR") 364, 367.] Plaintiff's position is defined as a light duty physical occupation requiring lifting, carrying, pushing and pulling in excess of 10 pounds and occasionally as much as 20 pounds. [AR 35.]

In May 2005, Plaintiff began to experience shortness of breath, "extreme fatigue" and a "flutter" in her heart. [AR 70, 364.] She sought treatment with cardiologist Dr. David Burkett, who diagnosed Plaintiff with a thoracic aneurysmal aorta and a bicuspid aortic valve disorder. [AR 15, 70, 364.] An aortic aneurysm is an abnormal and dangerous enlargement of the aortic wall that, upon spontaneous rupture, can cause blood loss and death. Plaintiff's aortic aneurysm originates at the root of the aortic valve and ascends through the aortic arch, initially measuring at 4.3 cm – almost twice the size of a normal thoracic aorta (2.5 cm). The bicuspid valve disorder is an anatomic anomaly wherein Plaintiff's aortic valve has two leaflets (instead of three) causing significant leakage, regurgitation and abnormal function of the aortic valve. In Plaintiff's case, her bicuspid valve disease causes a diminished blood flow through her aortic valve, and due to her enlarged aorta, her heart does not fill with oxygenated blood to be pumped sufficiently, resulting in fatigue and syncope episodes. Plaintiff was advised to reduce the stress

2

on her expanded aorta by minimizing physical activity, stress and blood pressure. [AR 42.]

Plaintiff sought a second opinion at the Cleveland Clinic Heart Center in Cleveland, Ohio. [AR 70.] Dr. Joseph Sabik confirmed the diagnosis of bicuspid valve disease and ascending aortic aneurysm, and recommended that Plaintiff undergo an open heart aortic valve and pulmonary valve replacement surgery, as well as a surgical homograph replacement of her aortic arch or a transplant with a cadaver aorta. [AR 71, 362.] However, additional testing demonstrated that Plaintiff had too many risk factors to proceed with surgery at that time. [Id.] Dr. Sabik advised Plaintiff to limit her activities to lessen the workload on her heart and to prevent expansion of the aneurysm. [Id.]

Plaintiff returned to work in August 2005. In early 2007, she experienced extremely high blood pressure, increased heart rate, and headaches. [AR 71, 365.] Hypertension is a serious condition because it places extreme pressure on Plaintiff's heart valves and aortic aneurysm with increased risk of rupture. Plaintiff was prescribed multiple medications in an attempt to stabilize her blood pressure, cardiothoracic disease, and related stress disorder. [AR 418.] These medications caused serious side-effects: fatigue, headaches, cramping, insomnia, anxiety, decreased concentration, dizziness and shortness of breath. [Id.]

B.   **The Disability Insurance Policy**

As an employee of Sanofi-Aventis, Plaintiff participated in a Group Accident and Health Insurance plan ("Plan"), which provided long-term disability ("LTD") benefits. Aetna Life Insurance Company ("Aetna" or "Defendant") issued a policy of insurance ("Policy") which funded the Plan and administered benefits claims under the Plan. The Policy provides that Aetna is a fiduciary, and "has complete authority to review all denied claims for benefits under this policy." [Policy 84.] The Policy also gives Aetna "discretionary authority to: determine whether

3

and to what extent employees and beneficiaries are entitled to benefits; and construe any disputed or doubtful terms of this policy." [Id.] The parties have stipulated that the Policy vests Aetna with discretionary authority to determine eligibility for benefits and/or construe the terms of the Policy. [doc. # 15.]

The Policy provides that benefits are payable for the first 24 months if the beneficiary is unable to work in his or her own profession. However, in order to continue to be eligible for benefits after the first 24 months of payments, an insured is disabled only if "you are not able to work at **any reasonable occupation** solely because of: -disease; or -injury." [Policy 88.]( emphasis added). A "reasonable occupation" is "any gainful activity for which you are; or may reasonably become; fitted by: education; training; or experience; and which results in; or can be expected to result in; an income of more than 80% of your adjusted predisability earnings." [Policy 100.]

    C.    **The Disability Claim**

On February 20, 2007, Plaintiff submitted a claim to Aetna for LTD benefits under the Plan because she was no longer able to return to work at Sanofi-Aventis. On August 19, 2007, Aetna accepted the claim and began paying her LTD benefits.

On June 24, 2009, Aetna reminded Plaintiff that the Policy's disability definition would change on August 19, 2009, and that Aetna "currently [had] no objective medical data that supports [Plaintiff's] inability to work." [AR 135.] Accordingly, Aetna requested that Plaintiff provide an Attending Physician Statement ("APS") from her physicians. [AR 135.] In addition, Plaintiff was advised that Aetna had attempted to obtain medical records from Dr. Sabik and Dr. Burkett. [Id.] Dr. Sabik's office indicated that Plaintiff had not been seen since 2008. [Id.] Plaintiff was asked to respond within 15 days to avoid her claim being closed, which she failed to

4

do.  [AR 135-36.]  On July 22, 2009, Dr. Burkett completed an APS.  [AR 366-67.]  Dr. Burkett indicated that he had been seeing Plaintiff every six months and that Plaintiff was able to work with others, able to give supervision, and able to work cooperatively with others in a group setting.  [AR 366-67.]  The only restriction Dr. Burkett noted was to limit "lifting / pulling / pushing" greater than twenty pounds.  [AR 367.]

On July 28, 2009, Aetna requested additional medical information from Plaintiff.  [AR 140-141.]  Plaintiff was warned that if the information was not received before August 12, 2009, "we will conclude that you are no longer eligible for benefits and your claim will close."  [AR 141.]  On August 14, 2009, Aetna informed Plaintiff that her LTD benefits were terminated for noncompliance.  [AR 146-49.]  The only medical information that Aetna had received was the July 22, 2009 APS from Dr. Burkett, but the only restrictions and/or (not to push, pull, or lift more than 20 pounds) would not preclude work capacity.  [AR 148, 366-67.]  On August 25, 2009, Plaintiff appealed, and Aetna agreed to further review Plaintiff's claim, under a reservation of rights, because Plaintiff provided a medical authorization form and additional medical documentation.  [AR 151.]  On November 6, 2009, Dr. Burkett submitted another APS. [AR 360.]  Like the previous statement from July 22, 2009, Dr. Burkett's only stated restriction related to lifting, pulling, and pushing more than 20 pounds.  [Id.]

Defendant performed a review of Plaintiff's records, which included a review of Plaintiff's medical records by an independent physician reviewer, cardiologist Dr. Leonard Pianko, and a peer-to-peer consultation between Dr. Pianko and Dr. Burkett.  [AR 323-25.]  During the peer-to-peer consultation, Dr. Burkett stated that Plaintiff "can perform any occupation without any difficulty."  [AR 324.]  Dr. Pianko concluded that there was no medical support for functional impairment.  [Id.]  Plaintiff's thoracic aneurismal aorta and bicuspid valve

5

disease were stable and she had the ability to perform other occupations. [Id.]

A vocational review performed by rehabilitation expert, Leanne Wolfinger, found there were reasonable occupations that Plaintiff could perform which fell within Plaintiff's transferrable skills set. [AR 384-416.] On June 4, 2010, Plaintiff was notified that her benefits had been terminated, effective May 31, 2010. [AR 162-64.] Plaintiff was given the opportunity to appeal within 180 days. [Id.]

On July 7, 2010, Plaintiff appealed the termination of benefits and provided information from Dr. Burkett, Dr. Chiara Liguori, and Dr. E.H. Baker. [AR 417-23, 439-40.] Dr. Burkett now stated that Plaintiff's shortness of breath and chest pain symptoms had not improved. [AR 383.] Dr. Burkett stated that he could not define Plaintiff's restrictions, limitations or prognoses and deferred to Dr. Liguori. [AR 383.] Dr. Liguori submitted an APS stating that Plaintiff was unable to work. [AR 420-21.] Dr. Liguori submitted a Capabilities and Limitations Worksheet, though it failed to identify whether or not Plaintiff could perform certain capabilities. [AR 422.] Dr. Liguori did indicate, however, that Plaintiff could frequently (i.e., 2.6 to 5 hours per day) lift five to ten pounds. [AR 422.] Dr. Liguori did not state when the restrictions began and, despite stating that Plaintiff had no ability to work, she clarified that Plaintiff was simply restricted from working a full day. [AR 421.]

During a peer-to-peer call on August 26, 2010, Dr. Burkett again confirmed to Dr. Feldman that Plaintiff was capable of performing sedentary or light-duty occupations. [AR 328.] Similarly, Dr. Liguori clarified the information from her APS and told Dr. Feldman that Plaintiff could perform sedentary work. [AR 328.] Dr. Feldman also found that Plaintiff could perform the occupations outlined in the vocational report. [Id.] In short, Dr. Feldman found that his review of the records and his conversations with Plaintiff's physicians did not support an

6

"inability to work" determination. [AR 329.]

Dr. Pianko also reviewed the updated information and concluded that Plaintiff's condition did not support the inability to work. [AR 316-19.] Dr. Pianko noted that a recent stress test performed by Plaintiff's own doctors revealed that there was no evidence of stress-induced ischemia and she had good exercise tolerance. [AR 317.] "The claimant . . . should be able to perform these positions based on her cardiac status and based on recent stress echo where she walked on the Bruce protocol for 8.2 METs and there was no evidence of stress-induced ischemia." [Id.] Dr. Pianko found that Plaintiff's condition has been stable, and that "[h]er symptoms are mild, of chest pain, shortness of breath with moderate exertion." [AR 318.] Further, there was "no evidence of rest-related symptoms." [AR 318.] Dr. Pianko also found that Plaintiff could perform "sedentary-type" jobs, such as the ones identified by the vocational consultant. [AR 319.]

Based on these reviews, Aetna denied Plaintiff's appeal on November 19, 2010. [AR 174-76.] The appeal denial letter noted that Plaintiff's cardiac condition remained stable and that her own physicians did not provide support for disability. [Id.] Aetna "determined that there was a lack of evidence (i.e. progress notes documenting abnormal physical exam findings, abnormal diagnostic testing, cognitive impairments in functioning, etc.) supporting a functional impairment in functioning that would have prevented you from performing the work of any occupation as of 6/01/10." [AR 175.]

Following the exhaustion of her administrative remedies, Plaintiff initiated litigation in this Court on March 28, 2012. [doc. # 1.]

## Analysis

"ERISA was enacted 'to promote the interests of employees and their beneficiaries in

employee benefit plans' and 'to protect contractually defined benefits.'" *Schadler v. Anthem Life Ins. Co.*, 147 F.3d 388, 393 (5th Cir. 1998) (citation omitted). To achieve these goals, ERISA requires every employee welfare benefit plan to,

> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
>
> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133.

When deciding whether to pay or deny benefits, a plan administrator must make two general types of determinations: "[f]irst, [s]he must determine the facts underlying the claim for benefits . . . . Second, [s]he must then determine whether those facts constitute a claim to be honored under the *terms* of the plan." *Schadler*, 147 F.3d at 394 (citation omitted) (emphasis in original). If a plan participant has been denied benefits, then ERISA permits a claimant to bring suit in federal court "to recover benefits due to [her] under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B).

Under ERISA, the factual determinations made by the plan administrator or fiduciary are reviewed for abuse of discretion. *S. Farm Bureau Life Ins. Co. v. Moore*, 993 F.2d 98, 100-01 (5th Cir. 1993) (citing *Pierre v. Conn. Gen. Life Ins. Co.*, 932 F.2d 1552 (5th Cir. 1991)). However, a plan administrator's interpretation or application of the plan is reviewed *de novo* "'unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Aboul-Fetouh v. Emp. Benefits Comm.*, 245 F.3d 465, 471-72 (5th Cir. 2001) (quoting *Firestone Tire & Rubber Co. v. Bruch*,

489 U.S. 101, 109 S.Ct. 948, 956-57 (1989)). Here, the parties have stipulated that the Policy vests Aetna with discretionary authority to determine eligibility benefits and/or construe the terms of the Policy. [doc. # 15.]

Abuse of discretion is synonymous with the arbitrary and capricious standard of review. *Cooper v. Hewlett-Packard Co.*, 592 F.3d 645, 651-52 (5th Cir. 2009) (citation omitted). "When reviewing for arbitrary and capricious actions resulting in an abuse of discretion, we affirm an administrator's decision if it is supported by substantial evidence." *Id.* Further,

> [s]ubstantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. An arbitrary decision is one made without a rational connection between the known facts and the decision or between the found facts and the evidence.

*Corry v. Liberty Life Assurance Co. of Boston*, 499 F.3d 389, 398 (5th Cir. 2007) (internal quotation marks and citations omitted).

The court's "review of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision fall somewhere on a continuum of reasonableness - even if on the low end." *Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 247 (5th Cir. 2009) (citation omitted).

Plaintiff does not appear to allege that Defendant has abused its discretion in interpreting the terms of the Plan itself. Instead, the bulk of Plaintiff's argument is directed at establishing that Defendant abused its discretion in its factual determinations - i.e., in finding that Plaintiff was no longer disabled and, thus, no longer entitled to LTD benefits. Whether a claimant is "disabled" is a factual determination that is reviewed for abuse of discretion. *McDonald v. Hartford Life Group Ins. Co.*, 361 Fed. App'x 599, 607 (5th Cir. 2010).

Here, Plaintiff has failed to show that Aetna's decision to terminate her LTD benefits was arbitrary and capricious. Defendant demonstrated that it considered the opinions of multiple

physicians and medical reviewers in evaluating Plaintiff's appeal. A review of those opinions leads to the conclusion that Defendant's decision to terminate Plaintiff's benefits was neither arbitrary nor capricious.

Dr. Burkett, one of Plaintiff's own doctors, provided several opinions and statements that Defendant could reasonably use to conclude that Plaintiff was able to return to work. In his APS dated July 22, 2009, Dr. Burkett noted that Plaintiff would be able to work with others, and the only limitations listed were that Plaintiff should lift/pull/push no more than 20 pounds. [AR 366-67.] On November 6, 2009, Dr. Burkett completed another APS with largely the same diagnosis as before and with no other limitations listed. [AR 360.] During his peer-to-peer consultation with Dr. Pianko on February 1, 2010, Dr. Burkett stated his belief that Plaintiff could perform any occupation without difficulty. [AR 324.] On June 11, 2010, Dr. Burkett noted that Plaintiff's clinical condition had not improved regarding shortness of breath and chest episodes, and he also stated that he could no longer define Plaintiff's restrictions and limitations and would defer to Dr. Liguori. [AR 383.] Finally, during a peer-to-peer call with Dr. Feldman, Dr. Burkett opined that Plaintiff could perform sedentary or light-duty work. [AR 328.]

Dr. Liguori, one of Plaintiff's cardiologists located at the Cleveland Clinic, provided a less optimistic assessment. On July 2, 2010, Dr. Liguori stated that Plaintiff's condition had regressed, that she remained unable to work, at least for a full day, and that she could lift no more than 10 pounds. [AR 420-21.] On August 31, 2010, Dr. Liguori back-tracked somewhat from her previous diagnosis and stated that Plaintiff could perform sedentary work. [AR 328.]

Based on the foregoing, the Court cannot say that Defendants acted arbitrarily and capriciously in deciding to terminate Plaintiff's LTD benefits. Undoubtedly, the Court might have made a different decision had it been charged with making the initial determination.

10

However, under the circumstances, the Court must not substitute its own judgment for that of Aetna's. Instead, it will affirm the decision if it is supported by substantial evidence. Here, Aetna relied extensively on the opinions of Plaintiff's own doctors, Dr. Burkett and Dr. Liguori, in making its determination to terminate Plaintiff's LTD benefits. Although Aetna's experts discounted some of the statements made by Dr. Liguori and Dr. Burkett, they did so after peer-to-peer conversations allowed them to clarify earlier statements. Thus, it was not arbitrary and capricious for Aetna to discount those previous contradictory statements. Therefore, it is clear that substantial evidence supports Aetna's determination.

If the plan administrator has a conflict of interest, the conflict is weighed as one of several different factors in determining whether there was an abuse of discretion. *Holland*, 576 F.3d at 248 (citations omitted). These unspecified factors depend upon the particular case and must be weighed together before deciding whether the plan administrator abused its discretion. *Schexnayder v. Hartford Life & Acc. Ins. Co.*, 600 F.3d 465, 469 (5th Cir. 2010) (citing *Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105 (2008)). "Any one factor may act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance." *Id*. (internal quotation marks omitted). Moreover, "a reviewing court may give more weight to a conflict of interest, where the circumstances surrounding the plan administrator's decision suggest "procedural unreasonableness." *Id*. (internal quotation marks and citation omitted).

A plan administrator suffers from a structural conflict of interest when, as here, it serves in the dual capacity of rendering benefit decisions on behalf of a plan that it also funds. *Schexnayder*, 600 F.3d at 470 (citing *Glenn*, 554 U.S. at 115). Plaintiff is correct in asserting that Defendant's dual role as the insurer and plan administrator implicates a potential conflict of

interest.  A benefit decision favorable to Plaintiff negatively impacts Aetna's bottom line.  The weight of this conflict of interest depends upon the circumstances of Aetna's decision.  *Id.*

However, the Fifth Circuit has stated that if a claimant does not "present evidence of the degree of the conflict, the court will generally find that any conflict is not a significant factor." *McDonald*, 361 Fed. App'x at 607 (citations omitted).   Here, the Court is not convinced that a significant conflict of interest exists.  Plaintiff has offered no substantial evidence to support her assertion regarding the degree of the conflict at issue.  Plaintiff's primary allegation is that Defendant chose to discontinue her benefits when it realized the significant financial liability it faced due to Plaintiff's long tenure with the company.  But Plaintiff offers no evidence that the amount of Plaintiff's LTD benefits played any factor in Defendant's decision.  Plaintiff does point out that Defendant initially awarded Plaintiff LTD benefits, and then reversed that decision, but the Fifth Circuit has indicated that "reversing a benefits decision is not evidence that a claims administrator abused its discretion." *See Ellis v. Liberty Assurance Co. of Boston*, 394 F.3d 262, 274 (5th Cir. 2005).   In addition, Plaintiff's disability benefits were awarded under the "own profession" definition of disability applicable to the first 24 months of payments, and discontinued under the more stringent "any reasonable profession" definition applicable to the payment of benefits after the first 24 months.

Plaintiff also criticizes the vocational report submitted by LeAnne Wolfinger and relied upon by Defendant's experts.  Ms. Wolfinger concluded that Plaintiff could return to work in a "reasonable occupation," either as a sales representative or a pharmacist.  Plaintiff contends it was improper to designate these occupations as "reasonable" because they required physical light duty, and Plaintiff argues she could not perform light duty work.  However, Plaintiff's own doctors gave statements indicating that she could perform light duty work.  Therefore, it was not

12

arbitrary and capricious for Ms. Wolfinger to conclude that such occupations were reasonable. Next, the Plan required that the "reasonable occupation" wage be at least 80 percent of Plaintiff's pre-disability income, the median occupational wage for the sales representative was only 75 percent. Ms. Wolfinger concluded that Plaintiff would likely find work above the 80 percent threshold because of her experience. Plaintiff disputes this methodology, but her own brief notes her extensive work experience. *See* [Plaintiff's Brief, P. 3.] Plus, Plaintiff fails to offer contradictory vocational evidence. Thus, the Court cannot say that Defendant acted arbitrarily and capriciously in relying on Ms. Wolfinger's assessment.

In conducting a review of whether a plan administrator abused its discretion, courts are limited to examining the evidence in the administrative record that was before the administrator when the benefits determination was made. *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 314 (5th Cir. 2007). Here, Plaintiff renews her request to supplement the Administrative Record with additional documentation. However, the Court previously declined to include this additional documentation in its Order dated November 6, 2012 [doc. # 22], and the Court sees no reason to reconsider that ruling.

Finally, both parties request attorney's fees and costs. ERISA provides that a court may use its discretion to allow reasonable attorney's fees and costs of the action to either party. 29 U.S.C.A. § 1132(g). In deciding whether to award attorney's fees to a party under section 502(g), the Fifth Circuit has suggested consideration of the following factors:

> (1) the degree of the opposing parties' culpability or bad faith;
>
> (2) the ability of the opposing parties to satisfy an award of attorneys' fees;
>
> (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances;

>  (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and
>
>  (5) the relative merits of the parties' positions.
>
> No single factor is determinative, but together they are the nuclei of concerns guiding our review.

*Banistor v. Ullman*, 287 F.3d 394, 408-09 (5th Cir. 2002) (citations and quotations omitted). In this case, factors (1), (2), (3), and (4) do not weigh in favor of either party. In addition, the facts supporting factor (5) are insufficient to merit an award of attorney's fees. Consequently, this Court holds that an award of attorney's fees is inappropriate in this case.

## Conclusion

For the above-assigned reasons, the Court finds that Aetna's decision to terminate Plaintiff Donna White's LTD benefits is supported by substantial evidence, and, thus, is not arbitrary and capricious. Accordingly,

**IT IS RECOMMENDED** that Plaintiff's claims [doc. # 1] be DENIED and DISMISSED WITH PREJUDICE.

**IT IS FURTHER RECOMMENDED** that both parties' requests for attorney's fees be DENIED.

**IT IS FURTHER RECOMMENDED** that each party shall bear its own costs.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.C.P. Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a

final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED in chambers, at Monroe, Louisiana, this 26th day of February 2013.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE